**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **KELVIN ROSS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **5:07-CV-433 (CAR)** |
| | : | |
| | : | |
| **CITY OF PERRY, GEORGIA, and** | : | |
| **CHIEF GEORGE POTTER, in his official** | : | |
| **capacity as Chief of the Department of** | : | |
| **Public Safety for the City of Perry and in** | : | |
| **his individual capacity,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

*ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S MOTION TO STRIKE*

　　　In this employment discrimination case, Plaintiff Kelvin Ross complains that while employed as a firefighter with the City of Perry, he was unlawfully discriminated against on the basis of his race and unlawfully retaliated against because he assisted and supported a female firefighter file a sexual harassment grievance in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), as well as 42 U.S.C. § § 1981 and 1983.  Plaintiff also complains he was constructively discharged in violation of his due process rights and that Defendants are liable under Georgia law for intentional infliction of emotional distress. Currently before the Court are Defendants' Motion for Summary Judgment [Doc. 16] and Plaintiff's Motion to Strike Errata Sheet of City of Perry Police Department Captain Heath Dykes [Doc. 14], and the respective responses and replies thereto.  Having read and considered

1

the motions, the record in this case, the applicable law, and the arguments of the parties, the Court find Captain Dykes' errata sheet is time-barred under Fed. R. Civ. P. 30(e) and therefore **GRANTS** Plaintiff's Motion to Strike [Doc. 14].  In addition, the Court finds Plaintiff fails to raise genuine issues of material fact on any of his claims and therefore **GRANTS** Defendants' Motion for Summary Judgment [Doc. 16].

## BACKGROUND

Because this case is before the Court on summary judgment, the Court must view the facts in the light most favorable to the non-moving party – in this case Plaintiff – and draw all favorable inferences in favor of that party.  Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 918, 918-19 (11th Cir. 1993).

Plaintiff, a forty-six year old African American male, was formerly employed by the City of Perry Fire Department ("Department") as a firefighter for almost sixteen years.  On January 23, 2007, Rene Kitchens, who at that time was a sergeant in the Fire Department and held a supervisory position over Plaintiff, filed a sexual harassment grievance[1] against her (and Plaintiff's) supervisor, Lieutenant Billy Gordon.  Prior to its submission, Plaintiff proofread Ms. Kitchens' grievance and then delivered the grievance on behalf of Ms. Kitchens to the Deputy Fire Chief.  Thereafter, an investigation ensued, and as a result Plaintiff resigned from employment as a firefighter in lieu of termination for the stated reasons that he lied during the investigation, was insubordinate, and displayed conduct unbecoming a firefighter.

---

[1] Defendants deny this grievance was a sexual harassment grievance, but for purposes of evaluating the Motion for Summary Judgment, the Court accepts Plaintiff's characterization that the grievance was a sexual harassment grievance.

2

Prior to the incidents described herein, Plaintiff had never been the subject of any disciplinary action during his sixteen-year employment with the Fire Department and by all accounts was a good man and a good firefighter. Plaintiff had known Rene Kitchens, his sergeant, before she joined the Perry Fire Department. Plaintiff and Kitchens were friends. They worked on the same shift and spent most of their free time in the firehouse together.

While employed with the Department, Kitchens was the City's only full-time female firefighter. Plaintiff and Kitchens confided in each other and even griped about and criticized their Lieutenant, Billy Gordon, to each other. It appears that Kitchens and Lt. Gordon did not particularly like each other; however, they tried to maintain a professional relationship. Plaintiff, as well as the rest of the Fire Department, knew that Ms. Kitchens had previously filed a sexual harassment claim against former Fire Chief Freddy Howell. As a result of that claim, Howell resigned.

Event Giving Rise to Ms. Kitchens' Grievance

Ms. Kitchens' grievance concerns a certain t-shirt incident that occurred on January 7, 2007. The incident took place during a shift change meeting wherein Lt. Gordon was briefing Plaintiff's shift, which was going off duty, and the next shift, which was coming on duty. While addressing the group, Lt. Gordon took off his jacket and turned around to reveal a t-shirt he was wearing. The back of the t-shirt revealed a picture of Firefighter Devin Robert lying on the front of a fire truck. In the picture, Firefighter Roberts was dressed in shorts, slippers, a hat, and a shirt that was pulled up exposing his stomach. His legs were spread apart. It also appeared as if Firefighter Roberts had something in his mouth. Above the picture were the words, "Stop it before it spreads," and beneath the picture was a caption that said, "Just Say No." Around the

picture was a red circle with a slash going through the picture.  All of the Firefighters, including Plaintiff but excluding Ms. Kitchens, laughed at the t-shirt.  Ms. Kitchens was the only female in the group.  She found the t-shirt to be "sexually suggestive" and offensive, particularly given her prior history within the Fire Department. (Kitchens Decl. ¶ ¶ 7, 11.)

The picture of Firefighter Roberts was taken by another firefighter in the Department, Justin Morgan.  Morgan took the picture using Firefighter Roberts' cell phone while they were both on duty.  While looking at the cell phone, another Firefighter, Bret Warmack, saw the picture and sent the picture to his cell phone.  Warmack also sent the picture to Lt. Rowell.  Lt. Rowell then created the t-shirt and asked Lt. Gordon to wear the shirt at a time when both shifts were present.  Lt. Gordon agreed and then exposed the t-shirt as described above.

Prior Sexual Harassment Complaints

Prior to the t-shirt incident, Ms. Kitchens had filed a sexual harassment complaint against former Chief of the City of Perry Fire Department Freddy Howell.  As a result of her sexual harassment complaint, former Chief Howell resigned from his position with the City.  It appears that all of the firefighters had some sort of knowledge about this complaint, be it direct knowledge or Department gossip.  Ms. Kitchens maintains that following Mr. Howell's resignation, many firefighters within the Department treated her differently, including Defendant Chief Potter.  Moreover, it appears Ms. Kitchens had a reputation in the Department for being promiscuous.  Many firefighters, including Defendant Chief Potter, referred to her as being "loose."  Most, if not all, of the firefighters in the Department stayed away from Ms. Kitchens. It appears the only firefighter who spent time with Ms. Kitchens was Plaintiff.

4

The Grievance

On January 22, 2007, fifteen days after the t-shirt incident occurred, Kitchens' grievance concerning the t-shirt incident was submitted to Defendants.  In the grievance Kitchens complained about Lt. Gordon wearing the t-shirt depicting Firefighter Roberts in a "lewd pose on the front of Pumper 1." (Pl. Ex. 1.)  She also complained that making and displaying the t-shirt while on duty was "unprofessional, disrespectful, and offensive." (Id.)  Because of alleged hostile treatment she received after filing her previous harassment claim against former Chief Howell, she asked Plaintiff to proofread the grievance and deliver the grievance to Deputy Fire Chief Joel Gray.  Plaintiff agreed to do so.  He proofread the grievance and then delivered it to Deputy Chief Gray by sliding it under his door early in the morning on January 22, 2007.

When Deputy Chief Gray arrived at his office and opened his door, he found the grievance.  After unsuccessfully attempting to locate Ms. Kitchens, Chief Gray then went to inform Defendant Chief George Potter about the grievance.   Upon reading the grievance, Defendant Chief Potter issued a memorandum to the City Manager informing him about the grievance. (Pl.'s Ex. 2.)  In the letter Chief Potter determines that the reporting of the grievance was in violation of two sections of the City's Grievance Policy because (1) the grievance was not submitted within five working days of the incident, and (2) the grievance was not presented properly through the chain of command. (Id.)  Chief Potter also concludes that he "viewed the preliminary evidence and [] fail[ed] to see anything of a lewd or harassing nature."  (Id.) However, Chief Potter calls for the incident to be "fully investigate[d]" and assigns Captain Dykes of the City of Perry Police Department together with Personnel Analyst Karen Bycenski to investigate the incident. (Id.)

The Investigation

Upon receiving instruction from Defendant Chief Potter, City of Perry Police Department Captain Heath Dykes and Detective Andrew Dodson began their investigation of the grievance. As part of their investigation, Captain Dykes and Detective Dodson first interviewed Ms. Kitchens, then Lt. Gordon, and then Plaintiff.[2]  During her interview, Ms. Kitchens first told investigators that Plaintiff had nothing to do with filing the grievance, but then admitted that she had asked him to proofread her grievance and to deliver it for her to Chief Gray.

On January 23, 2007, the day after Plaintiff delivered the grievance, the investigators conducted their first of two interviews of Plaintiff.  Out the outset of the interview, the officers warned Plaintiff that "knowingly making false statements may result in [his] prosecution. Employees, as well as complainants are under the same legal duty to be truthful."  (Ex. D-1, p. 1.)  Once the interview began, Plaintiff immediately told investigators he knew the grievance was about the t-shirt incident, but denied that he had read the letter:

| | |
|---|---|
| Dodson: | Did you read the letter? |
| Ross: | No. |
| Dodson: | You did not read it at all? |
| Ross: | No. |
| Dodson: | At no time did you read that letter? |
| Ross: | No. |

 (Id. at 2.)  After continued questioning by the investigators, however, Plaintiff eventually admitted that he had proofed the grievance letter:

---

[2] Although strongly disputed, for purposes of summary judgment, the Court will assume Captain Dykes knew of Plaintiff's involvement in delivering the grievance prior to beginning the investigation.

6

| Dodson: | You read the Administrative Investigative Witness Form is that correct? |
|---------|---|
| Ross: | Right. |
| Dodson: | And you understood that? |
| Ross: | Mum huh. |
| Dodson: | To be truthful. |
| Ross: | To be truthful. |
| Dodson: | OK.  Did [Kitchens] at any point and time ask you to proof that letter for her? |
| Ross: | Yes she did. |
| Dodson: | OK so when you told me earlier that you just looked over her shoulder that was incorrect? |
| Ross: | No I looked over her shoulder that is when I was like ok. |
| Dodson: | Did she give you that letter and say I need you to look over for it? |
| Ross: | She did. |

 (Id. at 3-4.)  Also during the interview, Plaintiff stated that although Ms. Kitchens found the t-shirt to be offensive, he did not find the t-shirt to be offensive, merely that it was "unprofessional."  (Id. at 9 -11.)  During their interviews, both Plaintiff and Kitchens admitted that they confided in each other about their criticisms of Lt. Gordon.

In addition to Plaintiff, Ms. Kitchens, and Lt. Gordon, the investigators also interviewed Lt. Rowell, who made the t-shirt, and Firefighter Roberts, who was depicted on the t-shirt.  As a result, they discovered that there was animosity between Ms. Kitchens and Lt. Gordon and that the firefighters on Kitchens' and Plaintiff's shift resented that Plaintiff and Kitchens held themselves apart.  The investigators also re-interviewed Plaintiff and Ms. Kitchens.  At no time during the investigation did the investigators ask Ms. Kitchens about her prior sexual harassment and allegedly discriminatory treatment she received as a female firefighter.

Upon completion of the investigation, Captain Dykes and Detective Dodson determined that Plaintiff had lied during the investigation based upon his statement that he had not read the

grievance, when he later admitted that he did, in fact, read it.  The investigators also determined that Plaintiff was insubordinate and had committed conduct unbecoming to an officer because he had discussed conduct of Lt. Gordon, his superior, with Ms. Kitchens.  Both Lt. Gordon, who wore the t-shirt, and Lt. Rowell, who made the t-shirt, received written reprimands.  Ms. Kitchens resigned.  No discipline was imposed on the remaining firefighters involved in the incident.

Show Cause Hearing and Resignation of Plaintiff

On February 14, 2007, twenty-three days after Plaintiff delivered the grievance, Plaintiff received a memorandum from Defendant Chief Potter informing him that as a result of the investigation, Plaintiff was accused of certain violations of both the City's and Fire Department's codes, including, lying in a departmental investigation, conduct unbecoming a firefighter, and insubordination.  The memorandum also informed Plaintiff that:

> The proposed action for these violations is your Dismissal from employment with the City of Perry.  You have a right to meet with me and the City Manager to make any presentation or to discuss any material or evidence that is pertinent to these charges and to show cause why the proposed action should be reduced.

(Ex. D-5.)  A show cause hearing was scheduled to occur two days later.

On February 16, 2007, twenty-five days after Plaintiff delivered the grievance, Plaintiff attended his show cause hearing.  At the hearing,  Defendant Chief Potter expressed disdain for Plaintiff's relationship with Ms. Kitchens:

> Chief Potter:   [W]hy would you allow yourself to be lead by a female and get yourself in this kind of trouble?  That is the first thing I want to know.  Why would you let yourself be lead?  You are a 16 year

> Veteran with a good head on his shoulders and a good record why
> would you let this female put you in this situation?

(Ex. D-11, p. 2.)

> Chief Potter:    You don't socialize with other guys on your shift, you just socialize with
> one female, who has a record of trouble everywhere she has been.  Do you
> recognize what that says about your reputation?

(Id. at p. 3.)  Chief Potter also expressed his intolerance of untruthfulness:

> Chief Potter:    I do not tolerate people who lie in Public Safety.  You are in a position as a
> firefighter, you do into the[ir] house to save the[ir] belongings.  You are in
> a position to testify in court.  If you lie they will not let you testify in court.
> You are documented on record on videotape admitt[ing] to telling things
> that were not true the first time to these investigators. . . .

(Id. at p. 5.)

> Chief Potter:    You cannot testify in court.  You are documented being dishonest.  Kelvin,
> you can never testify in court now.  It is a permanent record with the police
> department that you were caught being dishonest in an investigation after
> being advised of your rights. . . .

(Id. at 7.)  Chief Potter allowed Plaintiff the opportunity to defend himself;  Plaintiff apologized

for his actions and asked for forgiveness, but did not offer any explanation for his actions.  At the

conclusion of the hearing, Chief Potter gave Plaintiff a choice of being terminated or resigning:

> Chief Potter:    I don't want to have to fire you.  I am going to give you the chance to
> resign so I don't have to fire you so you can get a job somewhere else it is
> your choice. . . .
> Ross:            Chief Potter, Chief Gray.  I understand what you are talking about Chief
> Gray, give me a chance.
> Chief Potter:    I am going to give you a chance to resign because if you don't we are
> going to take you as far to court as we have to.  Your reputation will be
> such that you will not get a job in firefighting anymore.  If we have to go
> to court with you we will.  All that I am telling you is that I am going to
> give you a chance to resign so this does not go on your record.  It is your

9

> choice.  Write up what you want to Secretary to type and she will type it
> right now.  Date it today's date the 16th of February.

(Id. at p. 8.)   Immediately following the hearing, Plaintiff resigned from employment with the City.  Plaintiff did not file an appeal with the City Manager, and Plaintiff was later replaced by white male.

Thereafter, Plaintiff filed an EEOC complaint alleging race and age discrimination, as well as retaliation.  He then brought this lawsuit against Defendants alleging multiple claims including racial discrimination, retaliation, violation of procedural due process, and intentional infliction of emotional distress.

## DISCUSSION

### I.    Plaintiff's Motion to Strike

#### A.    Background

The Court will first address Plaintiff's Motion to Strike Errata Sheet of City of Perry Police Department Captain Heath Dykes. [Doc. 14.]   On May 7, 2008, Plaintiff deposed Heath Dykes, a Captain in the City of Perry Police Department who conducted the investigation into Ms. Kitchens' grievance.   At the conclusion of the deposition, Captain Dykes reserved his right to read and sign his deposition as provided for in Rule 30(e)(1) of the Federal Rules of Civil Procedure.  On June 10, 2008, the court reporter mailed a copy of the transcript of Captain Dykes's deposition to defense counsel.

On September 16, 2008, two days prior to the close of discovery and more than three months after Captain Dykes's deposition, defense counsel mailed to the court reporter a one page signed, but undated, errata sheet to his deposition.  The errata sheet contains seven changes

clarifying certain portions of his testimony.  Plaintiff asks this Court to strike the errata sheet as an impermissible attempt by the defense to substantively change Captain Dykes's testimony and as untimely.

B.    Analysis

Federal Rule of Civil Procedure 30(e) addresses a deponent's ability to make changes to his deposition.  The Rule states that "the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. . . ."  Fed. R. Civ. P. 30(e).  Thus, if a deponent wishes to amend his deposition testimony, the Rule requires (1) that changes be made within 30 days after notification that the transcript is available for review and (2) that the deponent sign a statement listing the changes and give reasons for the changes.  Although Captain Dykes satisfied the second requirement, he failed to satisfy the first as his errata sheet was not mailed until more than *three months* after the court reporter made the transcript available to him.

Defendants do not dispute that the errata sheet was mailed 98 days – more than three times the allowed time period – after it was due.  Defendants did not ask for an extension of the deadline, although that option was available.  Moreover, Defendants provide no explanation for the delay.  The errata sheet was filed over three months too late, and the Court will not allow such a blatant disregard of the Federal Rule of Civil Procedure.  Thus, the Court finds that the errata sheet is time-barred by the 30 day limitation of Rule 30(e)(1).  See Welch v. Mercer Univ., 304 Fed. Appx. 834, 837-38 (11th Cir. 2008) (district court did not abuse its discretion in striking an errata sheet filed more than one month too late).

11

II.      **Motion for Summary Judgment**

A.      <u>Standard of Review</u>

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. <u>See</u> <u>id.</u> at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  <u>See</u> <u>id.</u> at 254-55; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  <u>Celotex</u>, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of

material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

B.      Analysis

        1.      Abandoned Claims

        Plaintiff originally brought this suit alleging claims for race discrimination, age discrimination, retaliation in violation of Title VII and in violation of the First Amendment, violation of due process rights, tortious interference with business relations, intentional infliction of emotional distress, and punitive damages.  Defendants contend, and Plaintiff does not disagree, that Plaintiff has abandoned his claims for age discrimination, retaliation in violation of the First Amendment, and tortious interference with business relations by not addressing them in his response brief to Defendants' Motion for Summary Judgment.  The Court also agrees and deems these claims abandoned.  See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001) (holding that a claim included in a complaint but not raised at summary judgment is deemed abandoned); Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (same).  Thus, Defendants' Motion for Summary Judgment on Plaintiff's claims for age discrimination, retaliation in violation of the First Amendment, and tortious interference with business relations is **GRANTED**.

2.     Claims Against Chief Potter in his Official Capacity

Plaintiff also asserts discrimination, retaliation, and violation of due process claims against Chief Potter in his official capacity.  Suits against an individual in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Monell v. New York City Dept't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978).  "As long as the government entity receives notices and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Accordingly, in a suit against both a municipal entity and the entity's officer in his official capacity, the named individual defendant in his official capacity should be dismissed as redundant.  Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991).  Thus, because the complaint in this case alleges the same claims against both the City of Perry and Chief Potter in his official capacity, Defendants' Motion for Summary Judgment regarding the claims against Chief Potter in his official capacity is **GRANTED**, and the claims against Chief Potter in his official capacity are hereby DISMISSED as redundant.

3.     Section 1981 Claims

Plaintiff brings retaliation claims against Defendants under both 42 U.S.C. § 1983 and 42 U.S.C. § 1981.  However, § 1981 "does not provide an implicit cause of action against state actors; therefore § 1983 constitutes the exclusive federal remedy for violation of state actors of the rights guaranteed under § 1981."  Bryant v. Jones, 575 F.3d 1281, 1288, n. 1 (11th Cir. 2009) (citing Butts v. County of Volusia, 222 F.3d 891, 894-95 (11th Cir. 2000)).  Because Defendants here are state actors, Plaintiff's remedy is through § 1983.  Plaintiff cannot bring an independent claim under § 1981.  Thus, Defendants' Motion for Summary Judgment regarding Plaintiff's

14

claims pursuant to § 1981 is **GRANTED**, and these claims are DISMISSED.

    4.    <u>Race Discrimination and Retaliation Claims</u>

In his complaint, Plaintiff contends that Defendants discriminated against him on the basis of his race, retaliated against him for proof-reading and delivering Ms. Kitchens' grievance, and constructively discharged him in violation of Title VII, § 1981, and the Equal Protection Clause of the Fourteenth Amendment, actionable through § 1983. In accordance with the Court's previous rulings, however, the only discrimination and retaliation claims that remain are the Title VII and § 1983 claims against the City of Perry, and the § 1983 claims against Chief Potter in his individual capacity. The Court now turns to these claims.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1983 does not create any substantive rights, but instead, creates a remedy for the deprivation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment and § 1981. "Although the Supreme Court does not regard as identical the constraints of Title VII and the Federal Constitution, when section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same." <u>Underwood v. Perry County Comm'n</u>, 431 F.3d 788, 793 (11th Cir. 2005). As a result, this Court uses the same framework to evaluate Plaintiff's Title VII claims and Equal Protection race discrimination claims brought under § 1983. Because Plaintiff's discrimination and retaliation claims are based on the same facts, the legal standards governing each of these claims are the same; thus, it is unnecessary to

evaluate separately the Title VII and the Section 1983 causes of action.[3]  See Crawford v. Carroll,

529 F.3d 961, 970 (11th Cir. 2008) ("the analysis of disparate treatment claims under § 1983 is

identical to the analysis under Title VII where the facts on which the claims rely are the same.").

      a.    Standard of Proof : The McDonnell Douglas Framework

     In an action like the one at bar alleging disparate treatment, a plaintiff must prove an

intentional discriminatory motive by presenting either direct or circumstantial evidence of racial

animus.  See, e.g., Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004).  Absent direct

evidence, as is the case here, a plaintiff can establish intentional discrimination under the burden-

shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).

     Under the McDonnell Douglas framework, the plaintiff must first create an inference of

discriminatory intent and thus carries the initial burden of establishing a prima-facie case of

discrimination.  Once the plaintiff has set out a prima-facie case, a presumption of discrimination

arises, and the burden then shifts to the employer to articulate a legitimate, non-discriminatory

reason for the employer's conduct.  Cooper, 390 F.3d at 723.  If the employer successfully rebuts

the plaintiff's prima-facie case, the presumption of discrimination is eliminated, and the plaintiff

must then show that these reasons are pretextual, or present other evidence to show that

---

     [3] Even if the Court did not dismiss Plaintiff's § 1981 claims, they would be examined
under the same analytical framework as the Title VII and § 1983 claims, and thus it would be
unnecessary to the § 1981 claims separately from the Title VII and § 1983 claims.  See
Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) (stating that "[w]here, as here, a
plaintiff predicates liability under Title VII on disparate treatment and also claims liability under
sections 1981 and 1983, the legal elements of the claims are identical . . . [and] we need not
discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").

discriminatory intent was more likely the cause of the employer's actions.  Id. at 724.  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the employer's reasons are pretextual, the employer is entitled to summary judgment on the plaintiff's claims. Id. at 725.

        b.     Race Discrimination Claim

     Plaintiff contends that Defendants unlawfully discriminated against him on the basis of his race.  A plaintiff in a Title VII case alleging discriminatory treatment and relying on circumstantial evidence bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence.   A plaintiff can establish a prima facie case of racial discrimination by showing that he was (1) a member of a protected class; (2) qualified to do the job; (3) subjected to an adverse employment action; and (4) replaced by a person outside of his protected class or was treated less favorably than a similarly situated individual outside of his protected class.  Maynard v. Board of Regents of Div. of Univ. of Fla. Dept. of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003) (citations omitted); see also  Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005) ("A plaintiff does not shift the burden to the defendant under McDonnell Douglas merely by stating that he was fired or treated unfavorably.  McDonnell Douglas requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class.").  It is clear that Plaintiff meets three of the four requirements: He is a member of a protected class, African American;  he was clearly qualified for his position as a firefighter; and he was replaced by a person who is not in a protected class, a white male. Thus, the only element of the prima facie case at issue in this case is whether Plaintiff was subjected to an

adverse employment action.[4]

(1)     Prima Facie Case

The threshold question in establishing Plaintiff's prima facie case is whether Plaintiff voluntarily resigned his position with the City, as Defendants contend, or whether he was constructively discharged, as Plaintiff contends.  The Eleventh Circuit has long recognized that constructive discharge can satisfy Title VII's adverse employment action requirement.  See Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993).  To prove constructive discharge in the context of Title VII, a plaintiff must show that his "working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign."  Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (quoting Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir. 1989)).  To determine whether a plaintiff can state a claim for constructive discharge based on an alleged adverse employment action, the Eleventh Circuit has instructed lower courts to use an objective test, asking whether "a reasonable person in [the plaintiff's] position would view the employment action in question as adverse."  Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998).  When assessing whether a constructive discharge has occurred, the Court must determine whether the circumstances surrounding Plaintiff's resignation are sufficient to enable a reasonable jury to conclude that a reasonable

───────────────

[4] Defendants argue that Plaintiff cannot establish the fourth prong of his prima facie case, contending that in order to satisfy his prima facie case, Plaintiff must establish that a similarly situated employee outside of Plaintiff's protected class was treated more favorably than Plaintiff. While the Court acknowledges that this is, indeed, one way to satisfy his prima facie case, it is not the only way.  Plaintiff may also establish a prima facie case by showing that he was replaced by a person outside of his protected class.  See, e.g., Maynard, 342 F.3d at 1289; and Morris, 402 F.3d at 1082.  Because Plaintiff was replaced by a white male, the fourth prong is satisfied, and thus, the only element of the prima facie at issue is whether Plaintiff was subjected to an adverse employment action.

person in the plaintiff's position felt compelled to resign.  Doe v. Dekalb County Sch. Dist., 145

F.3d 1441, 1450 (11th Cir. 1998) (citing Steele, 867 F.2d at 1317).  In the Eleventh Circuit, the

threshold for establishing constructive discharge "is quite high."  Hipp v. Liberty Nat'l Life Ins.

Co., 252 F.3d 1208, 1231 (11th Cir. 2001).

  Employee resignations are presumed to be voluntary; however, this Circuit recognizes

two circumstances under which an employee's resignation will be deemed involuntary: (1) where

the employer forces the resignation by coercion or duress; or (2) where the employer obtains the

resignation by deceiving or misrepresenting a material fact to the employee.  Hargray v. City of

Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995) (citations omitted).  The Court finds that neither

of these circumstances is present in the case at hand.

  In determining whether coercion or duress played a part in the employee's resignation,

the Court must look at the totality of the circumstances and take the following factors into

consideration: (1) whether the employee was given some alternative to resignation; (2) whether

the employee understood the nature of the choice he was given; (3) whether the employee was

given reasonable time in which to choose; (4) whether the employee was permitted to select the

effective date of resignation; and (5) whether the employee had the advice of counsel.  Id. at

1568 (citation omitted).  However, "the mere fact that the choice is between comparably

unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or

coersion, hence involuntary."  Id. (citation omitted).  Specifically, where an employee resigns

because he is faced with an unpleasant alternative, the resignation is still voluntary because "the

fact remains that plaintiff *had a choice*.  Plaintiff could stand pat and fight."  Id. (citation

omitted).  "The assessment of whether real alternatives were offered is gauged by an objective

standard rather than by the employee's purely subjective evaluation; that the employee may

19

perceive his only option to be resignation . . . is irrelevant." Id.

In examining the totality of the circumstances, the Court finds that Plaintiff's resignation was voluntary.  Plaintiff argues that a reasonable jury could find that he was compelled to resign under threat of prosecution and an attempt to sully his reputation so that he could not secure future employment as a firefighter.   Thus, Plaintiff argues he had no choice but to resign. Although *Plaintiff* may have perceived his only option to be resignation, Plaintiff's subjective feelings are not relevant in determining whether he was presented with choices.

Plaintiff was given advance notice of the charges against him and the opportunity to present evidence at his show cause hearing on his behalf.  On February 14, 2007, two days prior to the show cause hearing, Plaintiff was aware of the charges against him and that the proposed action was dismissal.  Plaintiff had been informed that he "a right to meet with [Chief Potter] and the City Manager to make any presentation or to discuss any material or evidence that is pertinent to the charges and to show cause why [the] proposed action should be reduced." (Ex. D-5.)  In addition, Plaintiff understood the charges against him and the nature of the choice before him.  During the hearing, Chief Potter told Plaintiff, "I am going to give you the chance to resign so I don't have to fire you so you can get a job somewhere else.  It is your choice. . . ." (Ex. D-11, p. 8).  Plaintiff then responded, "I understand what you are talking about Chief Gray, give me a chance."  (Id.).  It was Plaintiff's choice to resign in lieu of termination.  Plaintiff's available alternative was to be terminated for cause and contest such termination with the City Manager, which he chose not do.  The Eleventh Circuit has held that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges." Hargray, 57 F.3d at 1568.

The plaintiff in Hargray resigned from his employment with the city in lieu of being

prosecuted for grand theft.  The facts in <u>Hargray</u> are at least as bad, if not worse, than the facts in

this case.  The Eleventh Circuit found Hargray's resignation to be voluntary despite the facts that

he was intimidated to make the choice between criminal prosecution and resignation from

employment, and that he make such decision to resign while under time pressure and without the

advice of counsel.  <u>Id.</u> at 1570.  The Eleventh Circuit found Hargray's resignation to be voluntary

because, like Plaintiff in this case, he was free to leave the police station before signing a

resignation statement; he had advance notice of the charges against him; he was aware of the

allegations against him; he was given an opportunity to consider the alternatives; and he did not

request more time to make a decision or request to speak with his supervisor or an attorney.

Thus, the Court finds that Plaintiff's resignation was voluntary and was not the result of

coercion or duress.  The Court will not address the second circumstance in which a resignation

can be found to be involuntary because there are no allegations that Defendants misrepresented a

material fact that would induce Plaintiff's resignation.  Therefore, the Court finds that Plaintiff

was not constructively discharged.  Thus, Plaintiff cannot establish he suffered an adverse

employment action and fails to prove a prima facie case of racial discrimination.

(2)   <u>Legitimate-Nondiscriminatory Reason/Pretext</u>

Even if Plaintiff could establish a prima facie case of race discrimination, the Court finds

that Defendants would nevertheless be entitled to summary judgment because Plaintiff fails to

raise a genuine issue of material fact as to whether Defendants' proffered reasons for Plaintiff's

discharge were a pretext for race discrimination.  The evidence shows that Defendants had a

legitimate, non-discriminatory reason for discharging Plaintiff – that he lied during an internal

affairs investigation.  Thus, the burden shifts to Plaintiff to establish that this reason was pretext

for discrimination based on Plaintiff's race.

21

Pretext means more than inconsistency; pretext means that the employer's decision was motivated by race.  Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001).  If the proffered reason for discharge offered by the employer is "one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

Plaintiff has presented no evidence that these reasons for discharging Plaintiff were racially motivated and merely pretext for discrimination.  The *only* evidence in the record to establish that Defendants' decision was actually motivated by race is the fact that he was replaced by a white male.  This is woefully inadequate to rebut Defendants' proffered non-discriminatory reasons for Plaintiff's discharge.  Thus, Plaintiff fails to establish pretext.

For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiff's race discrimination claims is **GRANTED**.

### c.   Retaliation Claims

Plaintiff also contends that Defendants constructively discharged him from employment in retaliation for proof-reading and delivering Ms. Kitchens' grievance.  Because Plaintiff has presented only circumstantial evidence of retaliation and no direct evidence, proof of retaliation is controlled by the familiar McDonnell Douglas framework discussed supra.

### (1)   Prima-Facie Case

The anti-retaliation provisions of Title VII prohibit an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a) ;

see Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000).  To establish a prima-facie case of retaliation, Plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered adverse employment action; and (3) that there is some causal relationship between the two events.  Holyfield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997). Here, because Plaintiff cannot establish that he engaged in a statutorily protected expression, he fails to establish a prima facie case of retaliation, and Defendants are thus entitled to judgment as a matter of law on Plaintiff's retaliation claim.

A plaintiff alleging unlawful retaliation can show that he engaged in a protected act under Title VII through evidence of either "participation" in the investigation, proceeding or hearing of a Title VII claim, or "opposition" to an unlawful employment practice.  In this case, Plaintiff can only prove that he engaged in a statutorily protected activity through evidence that he "opposed" an unlawful employment practice because, as a matter of law, the "participation" prong does not encompass internal investigations conducted before the filing of an EEOC charge of discrimination.  See Crawford v. City of Fairburn, 479 F.3d 774 (11th Cir. 2007), vacated on other grounds by Crawford v. City of Fairburn, 482 F.3d 1305 (2007).  Plaintiff claims that by proofreading and delivering Ms. Kitchens' grievance, he engaged in the statutorily protected activity of opposing sexual harassment made unlawful under Title VII.  In order for an employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, he must be opposing conduct that is made an "unlawful employment practice" by Title VII.  It is not enough for Plaintiff to show that he opposed garden-variety unfairness or harsh treatment in the workplace; he is only protected from retaliation if the practices he opposed or complained about is specifically prohibited by Title VII.

To recover under a theory of retaliation, Plaintiff need not prove the underlying claim of

discrimination in order for the retaliation claim to succeed.  <u>Sullivan v. National R.R. Passenger Corp.</u>, 170 F.3d 1056, 1058-59 (11th cir. 1999).  He must, however, demonstrate a good faith, reasonable basis for believing that the underlying, allegedly discriminatory conduct or practice he was opposing constituted unlawful discrimination in violation of Title VII.  <u>See</u> <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999).  Plaintiff must show that he subjectively believed that Defendants were engaged in unlawful employment practices and that this belief was objectively reasonable in light of the facts and records presented.  <u>See</u> <u>Little v. United Technologies, Carrier Transicold Div.</u>, 103 F.3d 956, 960 (11th Cir. 1997).

Here, Plaintiff cannot establish that he had a subjective, good faith belief that the City was engaged in unlawful sex discrimination.  Plaintiff makes clear that he did not find the t-shirt offensive; he merely found it unprofessional.  Finding an employment practice "unprofessional" is a far cry from believing that such practice constituted unlawful discrimination in violation of Title VII and certainly does not qualify as a good faith belief that the City was engaged in unlawful sex discrimination.

Plaintiff argues that he can establish that he had a good faith, reasonable belief that the t-shirt incident was an unlawful employment practice because at the time he delivered the grievance, he believed *Ms. Kitchens* found the t-shirt incident to be an unlawful employment practice, to wit, sexual harassment.  Essentially, Plaintiff argues that he can establish a statutorily protected expression based on his good faith belief that a third party believed the employment practice to be unlawful.  Plaintiff, however, provides no legal authority for such a  proposition, and the Court could find no such authority on its own initiative.  The Eleventh Circuit has clearly stated that "a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in

24

unlawful employment practices." Little, 103 F.3d at 960.  The Court can find no legal authority to support Plaintiff's claim that he can establish a prima facie case of retaliation under the opposition clause if he shows that he had a good faith belief in *another's* good faith belief that their employer was engaged in unlawful employment practices.

Moreover, even if Plaintiff could establish that he had a subjective, good faith belief that Defendants engaged in sexual harassment, Plaintiff could not establish that such belief was objectively reasonable in light of the facts and circumstances in this case.  While a reasonable person could find the t-shirt to be inappropriate or unprofessional, no reasonable person could find that the t-shirt was sexual harassment in violation of Title VII.  The photo is at most, a mockery of a firefighter in a sexually-suggestive pose.   The t-shirt was neither aimed nor directed at Ms. Kitchens as the picture was revealed during a shift change where the most firefighters would be present.

Thus, because Plaintiff cannot establish either that he had a subjective, good faith belief that the City was engaged in an unlawful employment practice, or that such a belief, if established, would be objectively reasonable, Plaintiff cannot establish that he engaged in statutorily protected activity.  Therefore, Plaintiff fails to establish a prima facie case of retaliation, and the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's retaliation claims.

3.     Violation of Due Process

Plaintiff also alleges that Defendants violated 42 U.S.C. § 1983 by depriving him of his property interest in continued employment without providing the due process of law guaranteed to Plaintiff by the Fourteenth Amendment to the United States Constitution.  Specifically, Plaintiff claims that Defendants failed to provide opportunity for meaningful review of the

decision to terminate Plaintiff.

To establish a § 1983 claim alleging a denial of procedural due process, a plaintiff must demonstrate "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 f.3d 1225, 1232 (11th Cir. 2003). Accordingly, the first inquiry for a due process challenge is "whether the injury claimed by the plaintiff is within the scope of the Due Process Clause." Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1296 (11th Cir. 2003).

Here, Plaintiff fails to establish the first element of his due process challenge. Plaintiff did not suffer a deprivation of a constitutionally-protected interest without procedural due process because he voluntarily resigned his position as a firefighter. As previously found by this Court, Defendants did not constructively discharge Plaintiff from employment. See supra, pp. 18 - 21. Therefore, there is no basis for finding that Defendants deprived Plaintiff of a property interest without due process. "If [Plaintiff] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that [Defendants] 'deprived' him of it within the meaning of the due process clause." Hargray, 57 F.3d at 1567. (citation omitted). Because Plaintiff cannot establish that he was deprived of his property interest, his procedural due process claim fails, and Defendants are entitled to judgment as a matter of law on this issue as well.

Even if Plaintiff could establish that he was constructively discharged and therefore was deprived of his property interest in his continued employment, Plaintiff's due process claim still fails because Plaintiff cannot establish a constitutionally-inadequate process. A plaintiff does not suffer a violation of his procedural due process rights unless and until the state refuses to make available a means to remedy the deprivation. McKinney v. Pate, 20 F.3d 1550, 1563 (11th

Cir. 1994).   If a state remedy "could have fully compensated the employee for the property loss he suffered," it satisfies procedural due process, even if the employee did not avail himself of it. Id. at 1564-65 (citation omitted).   This includes the remedial process state courts would provide if asked.  Horton v. Board of County Com'rs of Flagler County, 202 F.3d 1297, 1300 (11th Cir. 2000).  Plaintiff did not take advantage of the procedures available to him.  He could have appealed his case to the City Manager, but he did not.  He could have then appealed to the state court, but he did not.  Moreover, Plaintiff was afforded a hearing and was given notice of the charges against him and an opportunity to present evidence on his own behalf.  Plaintiff had constitutionally-adequate procedures available to him.  Thus, Plaintiff's procedural process claim fails, and Defendants' Motion for Summary Judgment on such claim is **GRANTED**.

      4.     <u>Intentional Infliction of Emotional Distress</u>

      Finally, Plaintiff asserts a state law claim for intentional infliction of emotional distress. Having dismissed the federal claims which this Court has original jurisdiction, the Court, however, declines to exercise supplemental jurisdiction over the remaining state law claim.  28 U.S.C. § 1367(c) allows a federal court in its discretion and in specified situations, to decline to exercise jurisdiction over state-law claims over which it has supplemental jurisdiction under § 1367(a).  One of those situations is when "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Therefore, Plaintiff's state law claim for intentional infliction of emotional distress is hereby **DISMISSED without prejudice**.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike [Doc. 14] is hereby **GRANTED**, and Defendants' Motion for Summary Judgment [Doc. 16] is hereby **GRANTED** as to all claims.

**SO ORDERED** this 30th day of September, 2009.


S/ C. Ashley Royal
C. ASHLEY ROYAL
United States District Judge


SSH